IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 1:13-CR-00259 |
| | : | |
| v. | : | (Judge Caldwell) |
| | : | |
| DANIEL THOMAS CURRAN, JR. | : | (Electronically Filed) |


## SUPPLEMENTAL BRIEF


AND NOW, comes the defendant, Daniel Thomas Curran, Jr., by his

attorney Lori J. Ulrich, Esquire, of the Federal Public Defender's Office, and files

this Supplemental Brief.


Respectfully submitted,

Date: May 5, 2014

*/s/ Lori J. Ulrich*_____
LORI J. ULRICH, ESQUIRE
Assistant Federal Public Defender
Attorney ID #55626
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
*<lori_ulrich@fd.org>*
*Attorney for Daniel Thomas Curran,Jr.*

## Table of Contents

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      Procedural History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Factual History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    Argument

        A.      The Government has argued that the search of the three bags was
                permissible for three reasons: 1) The bags were abandoned property,
                so a warrant was not required; 2) The detectives performed a
                permissible inventory search; and 3) At least one bag was open and
                some of its contents, including reported stolen items, had spilled onto
                the grass in open view. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                i.      The Government has failed to prove by clear and unequivocal
                        evidence that Mr. Curran abandoned his three bags.. . . . . . . . 12

                ii.     The Government has not proven that the search was an
                        inventory search. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                iii.    The Government cannot justify the search under the plain view
                        doctrine.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      The search of the storage shed was the product of the initial unlawful
                search of the three bags, and therefore, all items seized from the
                storage shed should be suppressed. . . . . . . . . . . . . . . . . . . . . . . . . 16

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# Table of Authorities

## Cases

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Horton v. California,*
    496 U.S. 128, 110 S.Ct. 2301 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Illinois v. Lafayette,*
    462 U.S. 648 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Murray v. United States,*
    487 U.S. 533 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Nix v. Williams,*
    467 U.S. 431 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*South Dakota v. Opperman,*
    428 U.S. 364 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Fulani,*
    368 F.3d 351 (3rd Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Herrold,*
    962 F.2d 1131 (3rd Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Menon,*
    24 F.3d 550 (3rd Cir.1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Price,*
    558 F.3d 270 (3rd Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wong Sun v. United States,*
    371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes**

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. §  2251(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2252A(a)(5)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Constitutional Provisions**

U.S. CONST. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

## I.  Procedural History

By indictment filed November 20, 2013, the defendant, Daniel Curran, was charged in a two-count indictment with enticing and coercing a minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of such conduct knowing or having reason to know that such visual depiction would be mailed, shipped or transported in interstate or foreign commerce, and that the materials for said production had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including a computer or camera, in violation of 18 U.S.C. §§ 2251(a) and 2251(e) and 18 U.S.C. § 2; and possession of child pornography, in violation of Title 18 U.S.C. § 2252A(a)(5)(B).

On March 14, 2014, Mr. Curran filed pretrial motions to suppress evidence, arguing that the warrantless search of three bags was in violation of the Fourth Amendment.  U.S. CONST. amend. IV.  On March 28, 2014, the Government filed its Response, arguing that the search was justified for three reasons: 1) The bags were abandoned property, so a warrant was not required; 2) The detectives performed a permissible inventory search; and 3) At least one bag was open and some of its contents, including reported stolen items, had spilled onto the grass in open view.  A suppression hearing was held on April 8, 2014.

This is a supplemental brief addressing the motion to suppress evidence, and adding the additional argument, *i.e.*, the subsequent search of the storage unit

1

was the product of the initial illegal search of the bags, and that, therefore, all items found in the storage unit should be suppressed.

## II.  Factual History

On September 24, 2013, Detective Michael Hine of the Northern York County Regional Police reviewed a complaint from R.S. that he had found his nine year old son in Mr. Curran's bed.  *See* (N.T. pg. 5).  On this same date, Detective Hine received a call from Officer Kraut regarding a report he had taken from Charles Hamm at the West Manchester Mall.  *See* (N.T. pg. 6).  According to Officer Kraut, Hamm said that he encountered Mr. Curran at the Mall and that Mr. Curran told Hamm that he had been kicked out of R.S.'s house because his son was found under the covers in Mr. Curran's bed.  *See* (N.T. pg. 7).  According to Hamm, Mr. Curran showed him several pictures on his phone of a naked girl and a naked boy who he described as R.S.'s children.  *See* (N.T. pg. 7).  The pictures were allegedly of a naked girl with her vagina spread open, a picture of a penis, and two pictures of anuses.  *See* (N.T. pgs. 7-8).  The next day, September 25, 2013, Detective Hine applied for a search warrant for Mr. Curran's phone.  *See* (N.T. pg. 9).

After applying for the search warrant, Detective Hine returned to headquarters where he met up with an individual named Rannells.  *See* (N.T. pg. 10).  Rannells allegedly told Detective Hine that he had done landscaping at the

2

residence of Mr. Curran and R.S., and that he had received a call from Mr. Curran that day telling Rannells that he no longer needed his services. *Id*. According to Rannells, Mr. Curran told him that R.S.'s son was in his bed, that the child was afraid of R.S. and that is why the child was in his bed, and that R.S. kicked him out of the residence. *Id*.

After interviewing Rannells, Detective Hine received a "web tip" from Mr. Curran that R.S. was abusing his son and perhaps his daughter. *See* (N.T. pg. 11). The tip included Mr. Curran's contact information. *Id*. Detective Hine called Mr. Curran, at which time Mr. Curran inquired as to whether Detective Hine was calling about the web tip that Mr. Curran had left earlier. *Id.* Mr. Curran told Detective Hine that he had a video that might show R.S. with his son. *See* (N.T. pg. 12). Detective Hine made arrangements to meet Mr. Curran by Big Lots. *Id*.

Detective Hine met with Mr. Curran at Big Lots, at which time Mr. Curran started showing Detective Hine a video; however, Detective Hine was unable to see the video due to darkness. *Id*. Mr. Curran told Detective Hine that he had placed the micro video recorder in the nine year old's room in order to catch R.S. in the act of abusing his son. *See* (N.T. pg. 13). Mr. Curran provided the video camera and the S.D. card to Detective Hine. *See* (N.T. pg. 13). At this meeting, Mr. Curran provided his cell phone to Detective Hine as required by the warrant.

3

*Id*. Detective Hine did not go through the phone at that time. *See* (N.T. pg. 14).

Detective Hine then got a search warrant for the video camera and the S.D. card.

*Id*. Forensic exams were not done immediately. *See* (N.T. pg. 15).

On September 25, 2013, Detective Hine received a second report from R.S.

*See* (N.T. pg. 15).   R.S. reported that he was going through the house and noticed

several items missing, including toys, a Nintendo DS, Nintendo DS games,

jewelry, photo albums, throwing stars, knives, large inert artillery rounds, and

unknown DVD movies. *See* (N.T. pgs. 15-16).  After receiving this report, on

September 26, 2013, Detective Hine applied for a search warrant for Mr. Curran's

vehicle, a Chevrolet Blazer. *See* (N.T. pg. 16).

On September 27, 2013, at 8:10 a.m., Detective Hine called McNamara

Auto Sales and learned that Mr. Curran was in the McDonald's parking lot at

Eastern Boulevard, near Memory Lane. *See* (N.T. pg. 18).  Mr. Curran had

previously told Detective Hine that if he needed to reach him, Detective Hine

could call McNamara Auto Sales as Mr. Curran's car had a GPS on it. *See* (N.T.

pg. 17).  The Detectives met up with Mr. Curran in the parking lot in order to

execute the warrant. *Id*.  Mr. Curran inquired as to whether Detective Hine was

done with his cell phone, to which Detective Hine replied that it was still being

examined. *Id*.  Detective Hine informed Mr. Curran that they were there to search

the car for personal items of R.S. missing from the residence. *Id*.  No stolen items

were found in the car.  *Id*.  After searching the car, the detectives asked Mr. Curran

if he had any storage units.  *See* (N.T. pg. 19).  Mr. Curran denied having any

storage units.  *Id*.  Mr. Curran informed the detectives that he had one earlier in

West York, but that he had closed it out.  *Id*.  After the search of the car, Mr.

Curran was "undetained."  *Id*.

 After leaving Mr. Curran, Detective Baker contacted both West York

Capital Storage and East York Capital Storage.  *See* (N.T. pg. 20-22).  Detective

Baker was informed by East York Capital Storage that Mr. Curran did have a

storage unit and that Mr. Curran was presently at his storage unit.  *See* (N.T. pgs.

21-22).  Detectives responded to East York Capital Storage and encountered Mr.

Curran.  *See* (N.T. pg. 22).  When Mr. Curran was first encountered, the detectives

noticed that he was looking over his right shoulder.  *See* ( N.T. pg. 22).  Mr.

Curran was handcuffed and placed in investigative detention.  *See* (N.T. pg. 23).

Curran was not under arrest.  *See* (N.T. pg. 36).

 It was at this point during the suppression hearing that Detective Hine's

testimony varied materially from information he had written in his police reports

the very evening of the arrest.  According to his hearing testimony, Mr. Curran

was handcuffed, given *Miranda* warnings, and placed in the police car.  *See* (N.T.

pg. 23).  Detective Hine claimed that he had not seen the bags outside the storage

facility when they detained Mr. Curran.  *See* (N.T. pg. 37).  The Detectives drove

5

Mr. Curran to his car, which was in the adjacent parking lot of Smoothie King. *Id*. The detectives were not sure he had done anything at this point. *See* (N.T. pg. 24). Detective Hine testified that they asked Mr. Curran why he was there and that Mr. Curran would not answer any questions. *Id*.

According to Detective Hine's testimony, Detective Baker had this revelation that maybe Mr. Curran had thrown something over the fence and instructed Detective Hine to check the fence. *Id*. Detective Hine testified that he got out of the car and walked over to the grass area, checked the fence line, and for the first time saw the bags in the grass. *Id*. This was the same area that Mr. Curran appeared to be glancing when first encountered by the Detectives. *See* (N.T. pg. 24). Government Exhibits 3 and 4 are pictures of the three bags as they were found, a blue Walmart Bag, a black and white Adidas Bag, and a larger backpack roller bag. *See* (N.T. pgs. 24-26).

Detective Hine initially testified that he saw a knife in a leather case, DVDs, a toy, and a diecast car consistent with what R.S. had reported stolen. *See* (N.T. pg. 27). When confronted on cross examination, Detective Hine conceded that he was not sure there was a knife in a sheath laying outside the bag or a toy diecast vehicle (Hot Wheels car). *See* (N.T. 52-53). In fact, the only items one can see in the picture are DVDs and film canisters. *See* (Gov't Exhibit 4 and Defense

Exhibits 103 and 102).  Detective Hine conceded that none of the items could be immediately identified as items belonging to R.S.  *See* (N.T. pgs.  41-42).

Detective Hine testified that he first confronted Mr. Curran about the bags when Mr. Curran was sitting in the patrol vehicle.  *See* (N.T. pg. 37).  According to his testimony, Mr. Curran denied that the bags were his.  In fact, according to Detective Hine's testimony, Mr. Curran was asked several times whether the bags were his and he denied that the bags were his until after Detective Hine retrieved the bags and took them to Mr. Curran.  *See* (N.T. 29).

In his direct testimony, Detective Hine testified that he then proceeded to open the Adidas bag, found a phone, took the phone to Mr. Curran, and asked Mr. Curran if the phone belonged to R.S.  *See* (N.T. pg. 27).  Mr. Curran admitted that the phone belonged to R.S.  *Id*.  It was only then that Mr. Curran allegedly admitted that the bags were his.  *See* (N.T. 29).  Detective Hine testified that he placed him under arrest.  *Id*.

In stark contrast to Detective Hine's testimony, his police report prepared the very night of the arrest contains the following chronologically of the events:

> I responded with Detective Baker to [the storage unit] and found Curran walking out of the gate entrance.  Curran was looking back towards the fence area when I first confronted him.  I approached Curran and placed him into investigative detention due to the possibility of destruction of evidence.  I observed Curran's vehicle to be in an adjacent parking lot near the storage facility.  There were several bags near the fence area Curran had previously been looking.

7

> Curran stated the bags were his.  I gave Curran miranda warnings at
> that time.  He stated the items were his and he threw them over the
> fence.  He stated he does have a storage facility at this business.
> When asked why he lied to me about not having a storage facility,
> Curran gave no reason.  Curran was placed into the back of the patrol
> unit and I checked the items that were in the field next to the fence.
> The blue Wal-Mart bag was spilled open with several camera film
> containers, a knife and child's toy laying in the grass.  I opened the
> black Adidas duffle bag and found a cell phone inside.  I asked
> Curran if the cell phone was Schmidt's.  He stated it was.

*See* (N.T. pgs. 37-40); *see also*, Defense Exhibit 100, Police Report, pg. 23.

In this report, Detective Hine reports that Curran immediately admitted the bags were his; while in his testimony he claims Curran denied the bags were his until confronted with the cell phone.  Acknowledging that his police reports and search warrants contained truthful facts, Detective Hine conceded that his testimony was inconsistent with his police report.  *See* (N.T. 38, 52).

According to Detective Hine, he "inspected" the bags before taking them to the police station.  *See* (N.T. pg. 28).  This is the only consistent fact between the testimony and the police reports, *i.e.*, all three bags were searched at the scene without a warrant.  *See* (N.T. pgs. 34, 42-43).  And more important, Detective Hine concedes, as he must, that he had no basis to arrest Curran before the bags were searched.  *See* (N.T. pg. 45).  After the bags were seized, they were taken to headquarters where they were inventoried.  *See* (N.T. pg. 30).

Following the events at the storage unit, both Detective Hine and Detective Baker applied for several search warrants. Detective Hine applied for a search warrant for the storage unit, citing the items found in the bags to support the warrant. *See* (N.T. pg. 48). The search warrant contained the following, "I observed Curran's vehicle to be in an adjacent parking lot near the storage facility. There were several bags near the fence area Curran had previously been looking. Curran stated the bags were his. I gave Curran miranda warnings at that time. He stated the items were his and he threw them over the fence...Curran was placed into the back of the patrol unit and I checked the items that were in the field next to the fence. One bag was spilled open with several camera film containers, a knife and child's toy laying the grass. I opened a duffle bag and found a cell phone inside..." *See* (Defense Exhibit 111, Search Warrant issued September 27, 2013, at 1:20 p.m. for Storage Unit).

Similarly, Detective Baker applied for a search warrant for the "Digital images seized from Daniel Curran to include: thumb drives, cellular phones, computers, external storage devices." *See* (Gov't Exhibit 8, Search Warrant issued September 27, 2013, at 1:15 p.m.). Detective Baker also cited the items found in the bags:

9

> Laying on the ground at the base of the fence surround (sic) the
> storage unit and separating the unit from Curran's vehicle was found
> three bags.  Curran advised he through (sic) the bags over the fence as
> he exited his unit.  Prior to the bags being placed in the trunk of
> the police unit, they were opened and numerous items reported by Rex
> Schmidt as stolen were found.  Curran was transported to Central
> Booking to be processed for theft charges.

*Id.*, (pg. 6, lines 120-123).

At 3:15 p.m., Detective Mark Baker applied for and received a second

search warrant for Mr. Curran's storage facility.  *See* (Gov't Exhibit 7, Detective

Baker's Search Warrant dated September 27, 2013 at 3:15 p.m.)  Detective Baker

again cites the items found in the bags to support the warrant:

> Prior to the bags being placed in the trunk of the police unit, they
> were opened and numerous items reported by R.S. as stolen were
> found.

*Id.* (Pg. 6, line 122).

The Government had argued in its initial brief that Mr. Curran had

abandoned the three bags.  *See* Gov't Response, pg. 8.  Mr. Curran testified at the

suppression hearing that on September 27, 2013, he went to his storage unit to

retrieve the three bags.  *See* (N.T. pg. 55).  He parked his car behind Smoothie

King, outside of the storage unit fence.  *Id.*  Mr. Curran retrieved his bags from his

storage unit, tried to exit the storage facility through a locked gate, and when he

realized it was locked, threw his three bags over the fence toward his car.  *See*

(N.T. pgs. 55-56).  His intent was to put the bags in his car.  *See* (N.T. pg. 56).  His

10

plans were thwarted when Detectives Hine and Baker detained him as he was exiting the storage facility.  He immediately claimed the bags as his own.  *Id*. Detective Hine conceded in his testimony that Mr. Curran may very well have thrown his bags over the fence in order to put them in his car.  *See* (N.T. pgs. 47-48).

## III.  Argument

     **A.**    **The Government has argued that the search of the three bags was permissible for three reasons: 1) The bags were abandoned property, so a warrant was not required; 2) The detectives performed a permissible inventory search; and 3) At least one bag was open and some of its contents, including reported stolen items, had spilled onto the grass in open view.[1]**

          **i.**    **The Government has failed to prove by clear and unequivocal evidence that Mr. Curran abandoned his three bags.**

A person has a privacy interest in the contents of his personal luggage unless he forfeits that interest by abandoning his property.  *See United States v. Fulani*, 368 F.3d 351, 354 (3rd Cir. 2004).  A court must determine from an objective viewpoint whether the property has been abandoned.  *Id*.  (Citations omitted).  The Government has the burden to establish proof of intent to abandon property by clear and unequivocal evidence.  *Id.*  (Citations omitted).

---

[1] The Government has not argued the "independent source doctrine," or "inevitable discovery," nor could the Government make such arguments.  Under the independent source doctrine, evidence initially discovered during an unlawful search can be admitted if the evidence is later obtained independently from lawful activities.  *Murray v. United States*, 487 U.S. 533 (1988); *United States v. Herrold*, 962 F.2d 1131, 1140 (3rd Cir. 1992).  Under inevitable discovery, the Government would have had to prove that the evidence would have been discovered by lawful means.  *Nix v. Williams*, 467 U.S. 431, 432 (1984); *Herrold, supra*.  Here, neither argument could prevail as the detectives never obtained a warrant for the bags, and therefore, never seized the evidence lawfully.  Moreover, Detective Hine conceded that he had no basis to arrest Mr. Curran prior to searching the bags.  *See* (N.T. pg. 45)

Here, Mr. Curran went to the storage shed to retrieve the bags, threw them over the fence in order to place them in his car, and was exiting the storage unit when he was arrested.  He told the officers the bags belonged to him.  More important, Detective Hine conceded at the hearing that Mr. Curran's argument that he was going to place the bags in his car was plausible.  *See* (N.T.  47-48)**.**

Detective Hine's testimony that Mr. Curran denied the bags were his is simply incredulous.  The very day of the arrest, Detective Hine reported both in his police report and search warrant that Mr. Curran immediately admitted the bags were his and that he threw them over the fence.  Significantly, the Government, in its initial response brief makes no mention of the fact that Mr. Curran denied the bags were his.  In fact, the Government argues that the fact that he admitted the bags were his was not fatal to the Government's argument that the bags were abandoned.  *See* Gov't Response, pg. 10.

The Government cannot prove by clear and unequivocal evidence that Mr. Curran had any intention of abandoning his property.  In fact, the evidence fully supports Mr. Curran's testimony that he threw the bags over the fence in order to put them in his car.

### ii.   The Government has not proven that the search was an inventory search.

The Government cannot justify the search as an inventory search for several reasons:  1) Mr. Curran was not under arrest when the bags were searched.  *See* (N.T. 36 and 45);  2) Detective Hine did not offer any testimony that the search was an inventory search; and  3) there was no testimony that the search was conducted pursuant to standard police procedures.  In *Illinois v. Lafayette*, 462 U.S. 648 (1983), the Court found that it was reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police stationhouse incident to booking.  *Id*. at 643; *See also, South Dakota v. Opperman*, 428 U.S. 364 (1976)(inventory searches permissible as they are done pursuant to standard police procedures).

Here, Detective Hine did not offer any testimony that the search of the bags was an inventory search; nor did he offer any testimony that the search was conducted pursuant to any standard police practices in their department. Therefore, this search cannot be justified as an inventory search.

### iii.   The Government cannot justify the search under the plain view doctrine.

Without citing a single case, the Government argues in its response brief that because there were a few items in plain view, all the bags could be searched.

14

*See* Gov't Response Brief, pg. 13.  This is a total stretch of the plain view doctrine. Finding items in plain view does not justify a search of the bags.

There are three requirements for valid seizures of evidence in plain view. "First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.'  Second, the incriminating character of the evidence must be 'immediately apparent.'  Third, the officer must have 'a lawful right of access to the object itself.'" *United States v. Menon,* 24 F.3d 550, 559–60 (3ʳᵈ Cir.1994) (quoting *Horton v. California,* 496 U.S. 128 at 141, 110 S.Ct. 2301, 2310 (1990).

Here, Detective Hine testified that he could not identify the items outside the bags as stolen items that belonged to R.S.  *See* (N.T. pgs. 41-42).  Therefore, the incriminating nature of the items was not immediately apparent.  Moreover, such observation would not justify a search of all three bags.  The plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.  *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971).

**B.     The search of the storage shed was the product of the initial unlawful search of the three bags, and therefore, all items seized from the storage shed should be suppressed.**

Each warrant obtained for the storage shed contained information about the unlawful search of the bags.  Detective Hine applied for a search warrant for the storage unit, citing the items found in the bags to support the warrant.  *See* (N.T. pg. 48).  The search warrant contained the following, "I observed Curran's vehicle to be in an adjacent parking lot near the storage facility.  There were several bags near the fence area Curran had previously been looking.  Curran stated the bags were his.  I gave Curran miranda warnings at that time.  He stated the items were his and he threw them over the fence...Curran was placed into the back of the patrol unit and I checked the items that were in the field next to the fence.  One bag was spilled open with several camera film containers, a knife and child's toy laying the grass.  I opened a duffle bag and found a cell phone inside..." *See* (Defense Exhibit 111, Search Warrant issued September 27, 2013, at 1:20 p.m. for Storage Unit).

Similarly, Detective Baker applied for a search warrant for the "Digital images seized from Daniel Curran to include: thumb drives, cellular phones, computers, external storage devices." *See*  (Gov't Exhibit 8, Search Warrant issued September 27, 2013, at 1:15 p.m.).   Detective Baker also cited the items found in the bags:

16

> Laying on the ground at the base of the fence surround (sic) the storage unit and separating the unit from Curran's vehicle was found three bags.  Curran advised he through (sic) the bags over the fence as he exited his unit.  Prior to the bags being placed in the trunk of the police unit, they were opened and numerous items reported by Rex Schmidt as stolen were found.  Curran was transported to Central Booking to be processed for theft charges.

*Id*., (pg. 6, lines 120-123).

At 3:15 p.m., Detective Mark Baker applied for and received a second search warrant for Mr. Curran's storage facility.  *See* (Gov't Exhibit 7, Detective Baker's Search Warrant dated September 27, 2013 at 3:15 p.m.)  Detective Baker again cites the items found in the bags to support the warrant:

> Prior to the bags being placed in the trunk of the police unit, they were opened and numerous items reported by R.S. as stolen were found.

*Id*. (Pg. 6, line 122).

All items seized from the storage shed are fruits of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471 (1963).  The Third Circuit Court of Appeals has held that a search warrant application will be upheld if after excising all the tainted evidence, probable cause is established from independent sources. *See United States v. Price*, 558 F.3d 270, 280 (3rd Cir. 2009).  "The independent source doctrine serves as an exception to the exclusionary rule and permits the introduction of 'evidence initially discovered during, or as a consequence of, an

17

unlawful search, but later obtained independently from activities untainted by the initial illegality.'" *Id., citing, Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L.Ed.2d 472 (1988).

Here, the Government has not established that probable cause exists absent the evidence from the unlawful search of the bags.  The evidence the detectives had prior to the unlawful search of the bags did not even rise to a level of probable cause to arrest Mr. Curran.  Detective Hine conceded that he had no basis to arrest Curran before the bags were searched.  *See* (N.T. pg. 45).  In fact, the detectives were not sure he had done anything wrong prior to the search of the bags.  *See* (N.T. pg. 24).

The detectives had no information that any stolen items would be in the storage shed; nor did they have any information that Mr. Curran may have been in possession of any child pornography outside of the phone that the detectives had already seized.   The detectives were motivated to apply for the search warrants for the storage unit by the items found during the unlawful search of the bags. Therefore, this Court should find that the search warrants were based on the initial unlawful search of the bags, that probable cause does not exist without the reference in the search warrant applications to the unlawful search, and that therefore, all items found in the storage unit should be suppressed.

18

Respectfully submitted,

Date: May 5, 2014                         */s/ Lori J. Ulrich*

LORI J. ULRICH, ESQUIRE
Assistant Federal Public Defender
Attorney ID #55626
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
*<lori_ulrich@fd.org>*
*Attorney for Daniel Thomas Curran, Jr.*

19

## CERTIFICATE OF SERVICE

I, Lori J. Ulrich, Esquire, of the Federal Public Defender's Office, do hereby certify that I served a copy of the foregoing **SUPPLEMENTAL BRIEF**, via Electronic Case Filing, and/or by placing a copy in the United States mail, first class in Harrisburg, Pennsylvania, and/or by hand delivery, addressed to the following:

> MEREDITH A. TAYLOR, ESQUIRE
> Assistant United States Attorney
> United States Attorney's Office
> 228 Walnut Street, Room 220
> Harrisburg, PA 17108
> <Meredith.Taylor@usdoj.gov>
>
> DANIEL THOMAS CURREN, JR.

Date: May 5, 2014          /s/ Lori J. Ulrich
                           LORI J. ULRICH, ESQUIRE
                           Assistant Federal Public Defender
                           Attorney ID #55626
                           100 Chestnut Street, Suite 306
                           Harrisburg, PA 17101
                           Tel. No. (717) 782-2237
                           Fax No. (717) 782-3881
                           <lori_ulrich@fd.org>
                           Attorney for Daniel Thomas Curran, Jr.