UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES )
   v. )
DANIEL THOMAS CURRAN, JR. )

No. 1:13-CR-259

FILED
SCRANTON
SEP 1 5 2017
Per_____
DEPUTY CLERK

ARGUMENT IN REPLY

I. CONTRARY TO THE GOVERNMENT, COUNSEL WAS INEFFECTIVE CONCERNING THE SUPRESSION HEARING.

    Counsel's failure to argue that Mr. Curran had not abandoned his reasonable expectation of privacy in his bags because ordinary persons can reasonably expect a law abiding person to leave their property alone if asked to and that Mr. Curran would never have been in a position where he could not protect his property by verbally requesting any persons approaching his property before they came into close enough proximity to the bags to open and inspect them but for being detained by law enforcement was deficient.

    There is nothing in the record showing that Mr. Curran was or would have put himself in a position where he could not advise oncoming persons that the bags belonged to him and to leave them alone or that he would not have done so and such would be a reasonable attempt to protect the contents of his bags from inspection by law abiding citizens. In fact, the record shows that no one was anywhere near the bags even after law enforcement put Mr. Curran into investigative detention, placed him in the car, pulled out and drove over to the Smoothie King parking lot, got out of the vehicle, and looked down the fence line locating the bags. See Suppression Hearing Transcript (Supp Tr), pp 22-26. By keeping himself in a position where he was able to request any oncoming

1

persons to leave his property alone before they get too close to his bags to stop them before they get too close to his bags to stop them from inspecting their contents, Mr. Curran made a reasonable attempt to protect his privacy interests in the bags' contents.

But for counsel's deficient performance, the outcome of the suppression hearing would have ultimately been different because this objection would have been on the record for appeal and the Court of Appeals would have been unable to find that Mr. Curran's actions clearly and unequivocally demonstrated an abandonment of his reasonable expectation of privacy in the bags.

Counsel's failure to attack Detective Hine's credibility at the suppression hearing by admitting the Schrade knife and blue bag into evidence as exhibits, procuring and admitting video surveillance from the storage facility into evidence as an exhibit, and eliciting testimony from Mr. Curran as to the order of events that occurred when he first encountered Hine at the storage facility and as to the contents of the blue bag, whose contents had spilled out into plain view onto the ground, was deficient.

Hine's report alleges that Rex Schmidt reported several items missing from his residence since Mr. Curran moved out; specifically mentioning a necklace, bracelet, ring, his son's Nintendo DS, photo albums, knives, throwing stars, nunchucks, two bayonets, throwing stars, old bullets, and his old cell phone, items that Schmidt believes Mr. Curran took, and that Mr. Curran said he has a storage shed somewhere, but Schmidt is unsure where. See NYCRPD Incident Report (Inc Rpt), p. 22.

2

In a subsequent report, Hine alleges that Detective Baker contacted a clerk from Capital Self Storage in East York who advised him that Mr. Curran has a storage unit there and was currently at his storage unit; that Hine responded to the storage facility and found Mr. Curran walking out of the gate entrance; that Mr. Curran was looking back to the fence area when Hine first confronted him; that Hine placed Mr. Curran into investigative detention at that point; that Hine discovered several bags near the fence where Mr. Curran had previously been looking which Mr. Curran claimed belonged to him; that a blue Wal-Mart bag was spilled open with a knife and an unspecified child's toy laying in the grass; that Hine opened the black Adidas bag and found a cell phone inside that Mr. Curran admitted belonged to Schmidt; that the black Adidas bag, blue Wal-Mart bag, and a large black and gray Extreme bag were seized as evidence; and that a search warrant for Mr. Curran's storage unit was obtained after. See id, at 23.

At the suppression hearing, Hine intentionally gave testimony he knew to be false, severally, in an attempt to gain a tactical advantage over Mr. Curran; to wit:

1. In describing his initial encounter with Mr. Curran at the storage facility, Hine stated: "I had rounded the corner, and at that point Mr. Curran was walking towards me. He didn't see me because he was looking over his right shoulder. So I quick [sic] came back around the corner, because there was a gate that I wasn't sure where he was actually going at that point. I heard the gate open. And I came around the corner. As he was walking out, I said, Dan, I thought you didn't have a storage unit. He put his head down. And at that point, I detained him." Id, at 22. Hine had a strong motivation to falsify the encounter; Pennsylvania law would have required suppression of the evidence

3

seized from the bags Mr. Curran threw over the fence because Hine detained Mr. Curran on private property. As a law enforcement officer, Hine necessarily understood the requirements of the law and may have believed that his mistake would require suppression in the federal case as well. Thus, Hine believed that if he did not falsely claim that he detained Mr. Curran after he went through the gate, the court would suppress the evidence seized from the bags. Hine's recollection of events was much to vivid to write off as anything other than a bad-faith fabrication; claiming he hid and then heard the gate open before he confronted Mr. Curran as he walked out.

2. After the AUSA asked Hine if he recognized any of the property that spilled out of the blue bag depicted in Government's Exhibit 4 at the suppression hearing, Hine stated: "There was a knife in a leather case. I believe that's what's on the ground. And there were DVD's that were laying there. There was also a toy, a diecast car, I believe, that I saw. And they were consistent with what Rex Schmidt had reported stolen." Id, at 27. Hine also claimed: "I believe the knife was under the handle where the two handles are." Id, at 41. Note that Hine's report failed to mention that any diecast car was stolen, nor does Hine's report claim than any of the spilled items match the description of the items reported stolen. See Inc Rpt, p. 22. Hine's motivation to fabricate false testimony was in his need to prove that he had reasonable suspicion to inspect the contents of the other two bags; he obviously did not believe that the incriminating nature of the evidence was readily apparent, nor did he believe any of Mr. Curran's prior actions, i.e., lying about the storage unit and throwing bags over the fence, gave him sufficient probable cause to arrest Mr. Curran, see Supp Tr, p. 45 (admitting he had no reason to arrest Mr. Curran until after he found Schmidt's cell phone in the Adidas bag), and thus, he believed that reasonable suspicion justified the search without a

4

warrant. But if he believed those items matched the description of the items reported stolen, then why did he fail to ask Mr. Curran if the spilled items belonged to Schmidt as he did when he found the cell phone in the Adidas bag? See id, at 42 (Hine "even asked Mr. Curran if that was Rex Schmidt's [phone], and [Mr. Curran] told [Hine] it was.")

3. After the AUSA asked Hine if he asked Mr. Curran if the bags were his, he said: "He didn't admit that they were his until they were brought up after I had gone down to retrieve them. When we did find the bags, we asked him, are those your bags. No, those aren't my bags. Are you sure those aren't your bags? Yeah, those aren't my bags. Go down and bring the items up. And he put his head down again." Id, at 29. He then claims that Mr. Curran finally admits the bags are his, but not until after Hine asked him about finding Schmidt's cell phone in the Adidas bag. See ibid. Hine later admitted that his testimony is inconsistent with his incident report which stated that Mr. Curran claimed ownership of the bags at the outset of the encounter. See id, at 38; and Inc Rpt, p. 23. Again, the details Hine recalls are much too vivid to be written off as anything other than a bad-faith fabrication and Hine has a strong motivation for fabricating false testimony: disclaiming ownership of property is sufficient to establish abandonment for purposes of the Fourth Amendment in most cases. See United States v Harrison, 689, F.3d 301, 307 (3d Cir. 2012).

Based on Hine's foregoing false testimony, the District Court found Hine's testimony credible despite Hine's inconsistent statement concerning whether or not Mr. Curran initially denied the bags were his because the Court did not find that these inconsistencies weighed heavily on Hine's credibility, and ultimately went on to find that the incriminating nature of the items that spilled out onto the ground was readily apparent and that the detectives had

5

probable cause to believe that Mr. Curran had committed theft based on the fact that Schmidt reported that Mr. Curran was the only other person who had access to the items that were missing; the detectives learned that Mr. Curran lied about having a storage unit; and that the detectives apprehended Mr. Curran removing bags from said storage unit. See United States v Curran, No. 1:13-CR-259 (DC Pa., May 19, 2014).

Admission of the Scrade knife (in its leather case) and the blue bag into evidence as exhibits at the suppression hearing would have refuted Hine's claim that the knife was found "under the handle where the two handles are." It is true that the knife later found in the bag after inventory was identified as a "Schrade knife in a sheath." See Inc Rpt, p. 40. But the knife and toys were placed in the bag by Hine before inventory was done and were originally in the Adidas bag. Mr. Curran would have testified that those items were never in the blue Wal-Mart bag until Hine put them there, and the image referred to at the suppression hearing supports his claim because none of those items are visible in that image; the leather case for the knife is black and too bulky to be hiding under the handles of the bag and the white thing seen by the handles is actually a baggage claim tag from Greyhound attached to the handles, not a knife.

It is unclear whether or not Hine was referring to the DVD's as well when he testified that the items were consistent with what Schmidt reported stolen because Hine only said "there were DVD's laying there," Supp Tr, p. 27, at the suppression hearing and it is not clear if "these items" include the DVD's; Hine did not mention that DVD's were reported stolen in his report, nor did Schmidt identify any DVD's as belonging to him in any of the property they

6

seized. See Inc Rpt, pp. 39-42. But it is clear that Hine would have no qualms with fabricating false testimony that Schmidt reported DVD's were missing, even if Schmidt did not report any DVD's missing, if he believes it is necessary to prevent the suppression of the seized evidence. Thus, attacking Hine's credibility was necessary to overcome his testimony.

Admission of the video surveillance from the storage facility into evidence as an exhibit at the suppression hearing would have proven that Hine did not hide behind the building until he heard the gate open and then detained Mr. Curran outside the gate (off of private property) as he claimed. Mr. Curran's testimony would also have confirmed the same. Mr. Curran's counsel for the state case has seen the video and told Mr. Curran that Pennsylvania law requires that all of the evidence seized would need to be suppressed because Hine cuffed him on private property and therefore, no case could be brought against him in the state because of it. Mr. Curran told counsel that his state appointed counsel had told him all of this, thus, she should have contacted his state appointed counsel to procure the video.

Finally, the foregoing evidence would have utterly destroyed Hine's credibility and counsel needed to do so in order to prove that he gave testimony he knew to be false under oath concerning the items he discovered in plain view. But for counsel's deficient performance, the District Court would have rejected that the incriminating nature of the items found in plain view was readily apparent and, even though the District Court may have still found that the detectives had probable cause to believe that Mr. Curran had committed the crime of theft, the Court of Appeals would have reversed the District Court's judgment because the detectives did not arrest Mr. Curran before the unlawful

7

search of the Adidas bag and the record shows that Hine would not have arrested Mr. Curran absent the unlawful search of the Adidas bag because Hine did not believe he had probable cause to arrest Mr. Curran until Mr. Curran admitted that the phone belonged to Schmidt. See Supp Tr, p. 45. Should Hine recant his statement now, it would lack any credibility whatsoever. Regardless, the District Court would have had to suppress the evidence seized from the bags and Mr. Curran would not have plead guilty to the indictment.

## II. CONTRARY TO THE GOVERNMENT, THERE IS A DOUBLE JEOPARDY VIOLATION HERE, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO BRING IT TO MR. CURRAN'S ATTENTION BEFORE OR DURING THE CHANGE OF PLEA HEARING.

The Government insists that Mr. Curran received and separately possessed child pornography such that there is no double jeopardy violation here and that different date ranges that do not overlap were alleged in the Superseding Indictment as well. See Govt's Br., pp. 13-14. But the only way the Government could come to the conclusion that the images were received and separately possessed in such a manner as to not constitute double jeopardy is if Mr. Curran is not being punished, in count 3, for possessing any of the same images that he is being punished for receiving in count 2, see United States v Miller, 527 F.3d 54, 58 (3d Cir. 2008) (holding that the Double Jeopardy Clause bars "convictions for both receiving and possessing the same images of child pornography."), or if there was a point in time where Mr. Curran no longer possessed those images and then possessed them again. Cf., United States v Yard, 558 Fed. Appx. 231, 235 & n. 2 (3d Cir. 2014). Thus, even if some of the images Mr. Curran is being punished for possessing, in count 3, are for images he is not being punished for receiving in count 2, double jeopardy still lies if he is being punished for possessing, in count 3, any of the images he is being

8

punished for receiving in count 2. Mr. Curran insists that he is, in fact, being punished for possessing the same images he is being punished for receiving.

Count 2 alleges that, between June 4, 2007, and April 1, 2011, Mr. Curran received child pornography "that has been transported in and affecting interstate commerce by any means, including by U.S. Mail or computer; to wit: CURRAN ordered and received videos depicting the lascivious exhibition of a minor's genitals and pubic area through the U.S. Mail." Superseding Indictment (Supp Indict), p. 3. At first glance, it would appear that count 2 is punishing Mr. Curran only for the images received through the mail, not by computer. But Mr. Curran objected at the change of plea hearing and his counsel informed both he and the Court that she had talked it over with the attorney for the Government, and that Mr. Curran is "admitting to receiving child porn by computer. He's not admitting that the Azo[v] videos that he received by mail are child porn." Change of Plea Hearing Transcript (Plea Tr), p. 6. To support count 2, the Government referred to "evidence that Mr. Curran had received multiple images on his computer and thumb drives that had been previously identified as child pornography by law enforcement in unrelated cases," see id, at 13, which are a subset of the "more than 40,000 images constituting child pornography" that the forensic review of his laptop and flash drives, conduct by the FBI, identified. See id, at 9-10. The Government never referred to any evidence of images received through the mail to support count 2 at the change of plea hearing.

Count 3 alleges that, between August 1, 2013, and September 24, 2013, Mr. Curran possessed images of child pornography "depicting prepubescent minors under the age of 12 years, including images of minors as young as infants,

9

engaging in sexually explicit conduct and portraying, among other things, sado-masochistic conduct and other depictions of violence, that had been mailed, shipped and transported in interstate and foreign commerce by any means, including by computer ... to wit: images ... depicting the lascivious exhibition of a minor's genitals and pubic area." Sup Indict, p. 4. The only images that had been transported in interstate commerce by computer that the Government referred to at the change of plea hearing to support count 3 that depict "prepubescent minors under the age of 12 years, including images of minors as young as infants, engaging in sexually explicit conduct and other depictions of violence" were some of the "more than 40,000 images" previously mentioned. See Plea Tr, p. 10 ("Some of the images on these devices are of children as young as infants, some show penetration of the genitals of children under the age of 12 years old by adults, and many depict sexually explicit conduct, including vaginal and anal penetration, bondage of children, and the lascivious exhibition of the genital area.")

The transcripts and exhibits from the grand jury hearings for both the original and superseding indictments will prove that all of the images "that had been previously identified as child pornography by law enforcement in unrelated cases" that Mr. Curran was punished for receiving in count 2, Mr. Curran is being punished for possessing in count 3.

The fact that the date ranges for counts 2 and 3 appear not to overlap in the indictment is of no moment in situations where, as here, the possession is a continuing offense that actually started upon receipt of the images and continued without intermission up until September 27, 2013, when they were seized by law enforcement. Ex Parte Neilsen, 131 US 176 (1889), is on all fours

10

with the current case.

In Neilsen, "there were two indictments; one for unlawful cohabitation with two women down to May 13th, 1888, and the other for adultery with one of the women the following day, May 14th, 1888." Id, at 185. The Supreme Court held: "If the unlawful cohabitation continued after the 13th day of May, and if the adultery was only a part of and incident to it, then an indictment for the adultery was no more admissible, after conviction of the unlawful cohabitation, than a second indictment for unlawful cohabitation would have been; and for the very good reason, that the first indictment covered all continuous unlawful cohabitation down to the time it was found. The case would then be exactly the same as that of Re Snow." Ibid. Stated in other terms, the Court said: "We are satisfied that conviction was a good bar ... because the material part of the adultery charged was comprised within the unlawful cohabitation of which petitioner was already convicted and for which he had suffered punishement." Id, at 187.

Likewise, the conviction for the receipt of illicit images in count 2 was a bar to his conviction for unlawfully possessing the same images in count 3 because the possession of the images that had been previously identified as child pornography in unrelated cases by law enforcement started upon receipt of them and continued up until September 27, 2013, when they were seized by law enforcement.

Counsel's failure to raise a double jeopardy objection at or before the change of plea hearing, or at least inform Mr. Curran of the issue before he agreed to plea to the indictment cannot be considered sound strategy and Mr.

11

Curran has been prejudiced because the punishment for both receiving and possessing the same images violates his right to not be put in double jeopardy for the same offense and his right to due process which requires that a plea of guilty be voluntary and intelligent.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Daniel Thomas Curran, Jr. respectfully requests that this Court vacate, set aside or correct his sentence.

Respectfully submitted,

Date: September 11, 2017.

Daniel Thomas Curran, Jr.
Reg. #71815-067
United States Penitentiary Tucson
P.O. Box 24550
Tucson, AZ 85734

## CERTIFICATE OF SERVICE

I, Daniel Thomas Curran, Jr., pro se, certify that I caused to be served, on this date, a hard copy of the attached Reply Brief of Movant, by placing a copy of same in the United States Mail, first class, in Tucson, Arizona, addressed to the following:

AUSA Meredith A. Taylor
United States Attorney's Office
228 Walnut Street, Room 220
Harrisburg, PA 17101

Respectfully submitted,

Date: September 11, 2017.

Daniel Thomas Curran, Jr.
Reg. #71815-067
United States Penitentiary Tucson
P.O. Box 24550
Tucson, AZ 85734



⇔71815-067⇔
Daniel Curran II
U.S. Penistentry Tucson
PO BOX 24550.
Tucson, AZ 85734-4550
United States

⇔71815-067⇔
Federal C
US DC M
PO BOX
Scranton,
United Sta